CITY OF ELKHORN, a Wisconsin municipality,
Plaintiff-Appellant,

v.

The 211 CENTRALIA STREET CORPORATION, a
Wisconsin corporation, Defendant,

NORTHBROOK PROPERTY AND CASUALTY INSURANCE
COMPANY and Northbrook National Insurance
Companies, foreign insurance corporations,
Zurich American Insurance Company and
American Guaranty and Liability Insurance
Company, foreign insurance corporations,
Defendants-Respondents.

Court of Appeals

*No. 03–2077. Submitted on briefs May 5, 2004.—Decided
June 30, 2004.*

2004 WI App 139

(Also reported in 685 N.W.2d 874.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Mark A. Peterson, Marvin I. Strawn* and *M. Susan Maloney* of *McNally, Maloney & Peterson, S.C.*, of Milwaukee.

On behalf of the defendants-respondents Northbrook Property and Casualty Insurance Company and Northbrook National Insurance Companies, the cause was submitted on the briefs of *Stacy A. Broman, William M. Hart* and *Damon L. Highly* of *Meagher & Geer, P.L.L.P.*, of Minneapolis, Minnesota.

On behalf of the defendants-respondents American Guaranty and Liability Insurance Company and Zurich American Insurance Company, the cause was submitted on the brief of *Mark M. Leitner* of *Kravit, Gass, Hovel & Leitner, S.C.*, of Milwaukee.

A nonparty brief was filed by *Peggy A. Lautenschlager*, attorney general, and *Hillary Schwab*, assistant attorney general, on behalf of the State of Wisconsin.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J.   This case involves contamination in the soil and groundwater at the site of the old Getzen Company, a manufacturer of musical instruments, located at 211 West Centralia Street in the City of Elkhorn.[1] The City filed a complaint against Getzen, arguing that as a result of Getzen's manufacturing

---

[1] When Getzen Musical Instruments, Ltd., the successor to The Getzen Company, Inc., was brought back into good standing, its name was changed to The 211 Centralia Street Corporation to avoid confusion in the community with another

operations, the soil and groundwater on Getzen's property is contaminated and the pollution emanating from Getzen's soil and groundwater has contaminated and continues to contaminate groundwater off the property, thus threatening the City's drinking water supply. Getzen, in turn, sought indemnification from its insurers, Northbrook Property and Casualty Insurance Company and Northbrook National Insurance Companies, Zurich American Insurance Company and American Guaranty and Liability Insurance Company.

¶ 2.   The issue before us on appeal is whether the circuit court properly concluded that, as a matter of law, there was no coverage for the City's claims under Getzen's comprehensive general liability and umbrella insurance policies because the environmental damage at the Getzen site was not caused by an "occurrence" as that term is defined in the policies. We hold, as a matter of law, that Getzen expected or intended that environmental damage would result from its deliberate dumping of untreated contaminants and, therefore, the environmental damage is not the result of an "occurrence" and coverage is precluded. We affirm the circuit court's grant of summary judgment in favor of Getzen and its insurers.

¶ 3.   From 1961 until 1991, Getzen manufactured brass musical instruments at the Centralia Street site. The manufacturing process at the site involved the machining, shaping and plating of a variety of metals into finished musical instruments. The process generated various waste contaminants, including heavy metals such as cyanide, cadmium, chromium, lead and barium and chlorinated solvents such as perchloroeth-

---

company which bought the Getzen name out of bankruptcy. For ease of reference, we will refer to The 211 Centralia Street Corporation as "Getzen."

ylene ("perc"), which was used for degreasing metal parts. The manufacturing process included at least one acid room and plating room. Each room contained floor drains connected to pipes, and these pipes ran directly into an unlined waste lagoon located behind the property. From 1961 until 1980, Getzen discharged its contaminated process waste water directly into the back-lot waste lagoon through the series of drains and pipes. Beginning in 1980, the waste water discharge into the lagoon was discontinued. The plant's effluent was treated and discharged into the municipal sanitary sewer system. In 1981, Getzen began storing its spent perc in fifty-five gallon drums, which a chemical recycling company picked up every ninety days.

¶ 4. Several former Getzen employees testified about Getzen's waste disposal practices during this time. Jeffrey Davis, who worked for Getzen during the 1970s and 1980s, testified that before the treatment system was installed, "[a]ny chemicals or wastes from the plating room or the acid room, and any wastewater, any rinse waters" went down the drain into the lagoon. These chemicals included cyanide, sulfuric acid, nitric acid, muriatic acid, electroplate, electroclean and plating solutions. He stated that at least seven hundred to eight hundred gallons of rinse waters were washed down the drain each day; any acid and solution dumps were in addition to this amount of waste.

¶ 5. He testified that while he assumed Getzen was using the same amount of perc before the company started barreling it up in 1981, he did not know whether the perc and another solvent went down the drain along with the rest of the waste prior to 1981. He averred that new perc was initially stored in one or two 250–gallon tanks located near a depression in a floor with a drain and a pipe that led to the outside of the

building. The drainage pipe was not attached to anything outside of the building and any fluid going into the depression in the floor would flow onto the ground outside. Davis further testified that a small degreaser tank located in a different room from the 250–gallon tanks was filled with perc as often as five to nine times a day by an employee using open buckets, which were carried throughout the plant. He stated that he never saw the employee spill the buckets. Finally, Davis testified that a larger degreasing tank was filled with perc using a fifty-five gallon drum on wheels. After the drum was rolled into position near the large degreasing tank, perc was drained out of the drum and into buckets through a valve. The filled buckets were emptied into the large degreaser.

¶ 6.   According to Davis, after the treatment system was installed in 1981, the perc was stored in a large tank outside the building on a stand that was near the drain. This tank would boil over if overfilled on a hot day.

¶ 7.   George Clauer, a longtime employee dating back to the early 1960s, indicated that the company also poured rinse water from the nickel, chrome or silver rinse tanks, cyanide solution, acid solution and alkaline solution down the drain leading to the lagoon. Robert Keegan, another longtime employee who worked at Getzen from 1972 until 1990, also testified. He related that the employees knew the acids discharged down the drain leading to the lagoon were hazardous and by 1979, the employees were aware of the environmental concerns arising out of the use of the lagoon. He stated that he saw spills of perc on the floors and that any spills went down the drains in the acid room and plating room. He also testified that he "assumed [the perc] just went into the lagoon with everything else."

¶ 8. Beginning in 1973, the Wisconsin Department of Natural Resources was in contact with Getzen concerning its waste disposal practices. On June 18, 1973, a DNR employee visited the Getzen site, noting:

> The Getzen lagoon continued to overflow. On talking to people inside [the] plant, it was found that the chemicals used in the plating operations at [Getzen] required the use of nickel, chromium, brass, copper, and cyanide . . . . No treatment of any of the waste is undertaken except for the lagooning, nor does a hauler remove the waste. It was mentioned that land disposal of these wastes was not an acceptable method and that chlorine destruction of the cyanides and other treatment methods should be looked into.

Just over two years later, in July 1975, the DNR again conducted an investigation of the site. The DNR reported:

> A meeting was held at the Elkhorn City Hall July 1, 1975 to discuss problems stemming from lagoon overflows at Getzen . . . . [T]he Milwaukee Road explained that in January, 1968 and January, 1970, pond overflow behind Getzen had caused one-car derailments because of ice over the tracks.

> The mayor is the downstream landowner and he has received crop damage to some degree for the past 10 years because of acid pond overflows. Alderman Joe Canastra told of continuing complaints from [a citizen] . . . . [The citizen] explained . . . [a] few years ago [her] son received acid burns from playing near the ponds. The city shares the concern of children getting in or near the ponds.

The report also referenced a previous 1975 visit by the DNR when its representatives "again suggested changes. To date, nothing has been done." According to the DNR representative, "The companies will drag their

feet until the last minute." Shortly after this visit, in late July 1975, the DNR wrote Getzen, directing Getzen to "immediately embark on a phased program which will protect the public health as well as ultimately result in satisfactory treatment of your process wastewaters before they are discharged to waters of this State." The letter further instructed Getzen to take several immediate steps to eliminate the "overflow of process wastes to surface waters," but noted that "the [steps] are considered only interim, emergency measures which must be done now and that additional improvements will be essential in the form of controlled waste water treatment preceding any discharge to ground or surface water or to the municipal sewerage system." In July 1975, Getzen sent the DNR a letter indicating that it had been working on the problems internally.

¶ 9. In August 1975, apparently in response to the Getzen letter, the DNR again wrote Getzen:

> On June 14, 1973, [an employee] inspected the Getzen Company facility and reported informing the company that land disposal was no longer an acceptable method of getting rid of plating waste. Industry has not recognized this method since the 1940s. He recommended other methods.

> During [the] 1974 visit [the DNR] questioned what progress had been made by the Getzen company and was told none. In January of this year, [the DNR] again visited the Getzen Company and again asked of progress and again received none for a reply.

¶ 10. Six months later, in February 1976, the DNR again wrote Getzen concerning its continued use of the waste lagoon: "Your disposal lagoon is, in my opinion, definitely substandard and this has been brought to your attention before. The Getzen Company

has chosen not to move forward in this area when other corporations in your municipality have." In July 1976, the DNR issued a permit for waste water disposal into the lagoon. In late 1977, the DNR conducted an inspection at Getzen and concluded that Getzen was discharging quantities of untreated chemicals in excess of permit limits. In April 1978, the DNR issued Getzen a Notification of Non-Compliance for failing to submit discharge monitoring reports, failing to submit groundwater sampling reports and failing to use proper analytical methods for testing waste water.

¶ 11. In August 1978, the DNR recommended referral of the case to the attorney general's office based on numerous violations of environmental laws, including failure to submit discharge monitoring reports, failure to conduct twice monthly sampling, failure to collect samples using the sample type required, failure to use methods required to analyze samples and failure to conduct monitoring of the groundwater wells. The DNR referral noted that Getzen's president Harold Knowlton admitted to a DNR representative that Getzen had not submitted discharge monitoring reports because "[s]ome of the grab samples they had taken were over the permit limits and they didn't want to submit them to the State." Knowlton further admitted to the DNR representative that Getzen had "checked the groundwater wells occasionally and indicated that their test kit [unapproved by the DNR] showed high levels of heavy metals which he felt were due to the fact that they had used the pond for disposal for some twenty years." In September and October 1979, the process of formally referring the Getzen case to the attorney general for prosecution was completed. In the referral, the DNR noted that Getzen had "made little progress" towards correcting the permit violations and

it was possible that its failure to attain operational levels had "resulted in contamination of the groundwater."

¶ 12. In August 1980, the department of justice ordered Getzen to close and clean up its lagoon. Thereafter, Getzen installed the aforementioned waste water treatment system. In 1981, the DNR deemed the system adequate, but noted that elevated levels of contaminants in the groundwater could require continued monitoring of the medium. In 1988 and 1989, the DNR again cited Getzen with noncompliance due to high levels of metals in the waste water it disposed into the municipal sewer system. In 1991, the DNR conducted an inspection at the Getzen facility. Inside the waste water pretreatment room, the DNR representative found one inch of waste water and a filter bag dated June 6, 1990, containing waste sludge on the floor. The waste water was being discharged into a sump. There was a steady stream of waste water flowing across a concrete pad and down a hill. The representative returned the next day and found similar conditions.

¶ 13. In 1991, Getzen abandoned its facility due to bankruptcy. In 1996, the City hired Ayers and Associates, an environmental engineering firm, to assess the level of contamination on the Getzen property. The City does not own the property nor does it have a legal duty to clean up the site. The City, which depends exclusively on groundwater for its public and private water supplies, voluntarily incurred expenses to investigate and define the contamination in order to determine whether the City's wells were threatened. All three municipal wells are located within one-half mile of the Getzen plant.

¶ 14. Following the investigation, the City revived Getzen from bankruptcy and filed suit against the

594

company, alleging claims of negligence and nuisance. As stated earlier, Getzen has sought indemnification from its insurers. Northbrook issued primary and excess insurance policies to Getzen for three policy periods: December 1983 to December 1984, December 1984 to December 1985, and December 1985 to December 1986. Zurich issued primary and excess insurance policies to Getzen from December 1979 to December 1980.[2] The issues of coverage and liability were bifurcated; the liability portion of the trial was stayed until the coverage issues were resolved.

¶ 15. The City hired Scott Wilson and Jeffrey Steiner, employees of the firm of Ayers and Associates, to testify as experts on its behalf. Steiner, a hydrogeologist, described Getzen's waste management practices as "suspect." Steiner testified that his analysis revealed that chlorinated solvents had been in the groundwater since the 1970s. He opined that contaminants must have started getting into the soil as soon as the use of the lagoon began in 1961. He stated that the level of chlorinated solvents at the property was "the highest [he had] ever seen in soil." Steiner indicated that he was familiar with the DNR records concerning Getzen's violations. He stated that even back in 1978, a company in Getzen's position, which had been repeatedly approached by the government and told that it was violating the law, would have known that its actions were harming the environment, at least with respect to the dumping of heavy metals on the property. While Steiner limited this conclusion to heavy metals, he did

---

[2] There appears to be some dispute about the years in which Zurich provided insurance coverage to Getzen. Because of the decision we reach in this case, we need not address this issue further.

testify that he had no reason to believe that Getzen was treating chlorinated solvents any more carefully than it was the heavy metals.

¶ 16.   Scott Wilson, a soil scientist by trade, testified that contamination by chlorinated solvents and metals had been taking place over a period of twenty to thirty years. He stated that he would not attribute the contamination at the site to one big accident; rather, he testified that "there are not all kinds of isolated hot spots; that these releases have all kind of commingled together and it's been an ongoing event for some period of time . . . . [T]here's been so many releases of such high concentrations." He opined that at the Getzen site there were many sources of contamination that were typical of industry, including cracks in the plating room, dissolution of concrete walls where contaminations had oozed out, through the side of acid bathrooms, outside of doors where people had thrown out solvents, under existing tanks, next to the loading docks, out falls from the building where there were holes and drain pipes that exited the building. He further testified that the waste lagoon was a source, although it might not be a "primary" source, of chlorinated solvent contamination.

¶ 17.   The insurance companies filed motions for summary judgment, advancing several alternative arguments in support of their position that the policies did not afford Getzen coverage, including that:   (1) the environmental damages to the City resulted from Getzen's routine operation and was not an "occurrence" as that term is defined in the policies, (2) the City's claims were barred by the known-loss doctrines because Getzen knew of the environmental problems at the site when it purchased the policies, (3) the pollution exclusions contained in the policies barred coverage because the contamination was expected and/or intended. In a

well-reasoned decision, the circuit court granted the insurance companies' motions for summary judgment, explaining that coverage was excluded under the definition of "occurrence," the pollution exclusion clauses and the known-loss doctrines and that no genuine issues of material fact existed with respect to those issues. The City now appeals.

■■■

¶ 18.   We review summary judgment determinations de novo, employing the same methodology as the circuit court. *Roebke v. Newell Co.*, 177 Wis. 2d 624, 632, 503 N.W.2d 295 (Ct. App. 1993). Summary judgment is a drastic remedy and is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2001–02)[3]; *Lecus v. Am. Mut. Ins. Co. of Boston*, 81 Wis. 2d 183, 189, 260 N.W.2d 241 (1977). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991). "A factual issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (citation omitted).

■

¶ 19.   In addition, we are called upon to interpret an insurance contract. Interpretation of an insurance contract is a question of law which this court reviews de

---

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

novo. *Lambert v. Wrensch,* 135 Wis. 2d 105, 115, 399 N.W.2d 369 (1987); *Katze v. Randolph & Scott Mut. Fire Ins. Co.,* 116 Wis. 2d 206, 212, 341 N.W.2d 689 (1984).

¶ 20. On appeal, the City claims, inter alia, that summary judgment was not appropriate because genuine issues of material fact exist as to whether the contamination was a result of an "occurrence," as that term is used in the insurance policies at issue. The policies only provide coverage for damages arising out of an "occurrence" and each defines "occurrence" substantially the same: an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. The term "accident" has been interpreted to mean " '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.' " *Doyle v. Engelke,* 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998) (citation omitted). An "accident" also refers to an "event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result." *Kalchthaler v. Keller Constr. Co.,* 224 Wis. 2d 387, 397, 591 N.W.2d 169 (Ct. App. 1999) (citation omitted). In a similar vein, there is no coverage under the expected or intended language in the definition of "occurrence" when: (1) the allegations plead an intentional act or (2) the insured intended or expected some injury or harm to follow from its act. *Raby v. Moe,* 153 Wis. 2d 101, 110–11, 450 N.W.2d 452 (1990).

¶ 21. The environmental damage at the Getzen site was no accident. The testimony of former Getzen employees and the DNR records conclusively establish that Getzen's routine practice for disposal of waste

chemicals was to deliberately dump at least seven hundred to eight hundred gallons of contaminated waste water and other untreated chemicals down drains and into the unlined waste lagoon every day for some twenty years. The testimony also demonstrates it was Getzen's routine practice to have employees sweep spills and other floor waste, which included solvents, into the drains. The testimony of the City's experts bolsters these conclusions. Both Steiner and Wilson testified that the contaminants had been in the groundwater and soil since at least the 1970s, if not earlier. And, according to Wilson, "the contaminant sources have been a fairly continuous and ongoing event for some period of time," and "there are not all kinds of isolated hot spots; that these releases have all kind of commingled together and it's been an ongoing event for some period of time."

¶ 22. Furthermore, Getzen was well aware of the environmental consequences of its conduct. The paper trail detailing Getzen's history with the DNR began in June 1973 and ends with its bankruptcy in 1991. As early as 1973, after observing that Getzen did not treat any of its waste and a hauler did not remove the waste, the DNR informed Getzen that "land disposal of these wastes was not an acceptable method." In 1975, the DNR reported that a neighbor of the Getzen facility had complained that her son had received acid burns from playing near the lagoon. That same year, the DNR directed Getzen to embark on a program to "protect the public health" by treating its process waste waters "before they are discharged to the waters of this State." Again in 1975, the DNR informed Getzen not only that land disposal was not an acceptable method of getting rid of waste, but also that "[i]ndustry has not recognized this method *since the 1940s.*" (Emphasis added).

In the same letter, the DNR reminded Getzen that "[m]odern effluent regulations have eliminated any remaining possibility of continuing to discharge untreated water."

¶ 23. In 1976, the DNR told Getzen that its waste lagoon was "substandard" and admonished Getzen for not "mov[ing] forward in this area when other corporations in [its] municipality have." In 1977, the DNR found that Getzen was discharging quantities of chemicals in excess of permit limits and in 1978, recommended referral of the matter for prosecution based on violations of environmental laws. In a conversation with DNR officials, Knowlton, Getzen's president, admitted conscious violations of the law by telling the DNR representative that Getzen had withheld testing results because "[s]ome of the grab samples they had taken were over the permit limits and they didn't want to submit them to the state." When the DNR finally referred Getzen for prosecution, it wrote, "Getzen . . . has made little progress towards correcting these violations of their permit conditions," and worried "that the company's failure to attain operational levels has resulted in contamination of the groundwater."

¶ 24. As Getzen's lengthy relationship with the DNR demonstrates, there can be no dispute that Getzen knew its methods of disposal were unacceptable and were contaminating the soil and groundwater, but chose not to conform its practices to industry standards. Thus, the record conclusively establishes not only that the dumping of contaminants was deliberate, but also that the environmental damage was an entirely expected, if not intended, result of Getzen's conduct.

¶ 25. In a nonparty brief, the State argues that whether Getzen expected or intended the environmental damage is a question of fact, which cannot be

determined as a matter of law. The State contends that the insured must have a subjective intent to cause specific damage. While the State is generally correct that intent has a subjective component and, therefore, can be a question of fact for the jury, there are occasions where intent can be found as a matter of law. *See Loveridge v. Chartier*, 161 Wis. 2d 150, 169, 468 N.W.2d 146 (1991).

¶ 26.   While a court may infer intent to injure as a matter of law only in narrow circumstances, it may do so "if the degree of certainty that the conduct will cause injury is sufficiently great to justify inferring intent to injure as a matter of law." *Id.* at 169–70 (citation omitted). Thus, it is an objective standard and actual expectation or intent to cause a specific harm is not necessary to preclude coverage. *See id.* at 169. Whether to infer as a matter of law such intent or expectation is to be determined on a case-by-case basis. *Id.* at 169–70.

¶ 27.   Here, there can be no doubt that Getzen, through its many communications with the DNR, knew that its activities were harming the environment. Indeed, the City's own expert conceded that a party in Getzen's shoes who had been told repeatedly by the DNR that it was violating the law would have been aware that it was causing environmental harm. Given the nature of Getzen's conduct and the extent of its knowledge about the consequences of its actions, we conclude that Getzen's intent to cause environmental damage can be inferred as a matter of law. We, therefore, reject the State's argument.

¶ 28.   The City challenges the circuit court's ruling that there was no genuine issue of material fact as to whether the environmental damage was an "accident"

on two grounds. First, the City draws a distinction between metal contamination and solvent contamination, asserting that the real danger to the City's drinking water comes from solvent contamination. The City submits that the contamination from the soil and groundwater resulting from the waste lagoon had "very little to do with the solvent contamination." The City then maintains that the evidence demonstrates that the contamination by the solvents actually resulted from "countless accidental spills, during its metal-plating and finishing operations over three decades."

¶ 29. We reject the City's attempt to make relevant the distinction between solvent and metal contamination. In 1973, the DNR reported that Getzen did not undertake treatment of *any* of the waste, with the exception of the lagoon, and a hauler did not remove the waste. While two of the employees could not testify as to what happened with the spent perc, Keegan testified that he "assumed [the perc] went into the lagoon with everything else." And, Davis testified that used perc or solvent was not shipped off site until after Getzen started to collect spent perc in barrels, which did not occur until after 1981, when Getzen set up the waste water treatment system. Further, the City's own experts testified that the waste lagoon, while maybe not a primary source, was a source of solvent contamination. According to Wilson, the chlorinated solvent contamination occurred over a long period of time and consisted of many releases of "high concentrations." This leads to only one conclusion—that it was Getzen's ongoing and continuous business practices, not a few drips and spills from a bucket or spigot, which caused what Wilson and Steiner conceded were the highest levels of perc-related contamination that they had ever seen in soil.

¶ 30. Next, the City argues that Getzen's practice of disposing its waste into an unlined lagoon was a common and "entirely lawful, industrial practice." Thus, according to the City, Getzen could not have intended to cause environmental damage. The record belies this claim. The record establishes that the DNR repeatedly warned Getzen in the mid-1970s that this method of disposal was unacceptable and had not been an acceptable practice within the industry since the 1940s. Getzen chose not to heed the DNR's warnings and continued to discharge untreated waste water into the lagoon in violation of environmental laws and its permit. Even the employees knew that the acids discharged down the drain leading to the lagoon were hazardous and were aware of the environmental concerns arising out of the use of the lagoon.

¶ 31. In sum, there are no genuine issues of material fact with respect to whether the contamination was the result of an "occurrence" that would require a trial. The record conclusively establishes that Getzen's routine practice was to pipe hundreds of gallons of untreated waste water and other chemicals into an unlined lagoon. The record further establishes that Getzen was well aware that this practice would cause environmental damage. As the circuit court rightly observed, "Getzen's dumping of hazardous materials was not an accident—it was [thirty] years of deliberate dumping." We affirm.

*By the Court.*—Judgment affirmed.