NCR Corporation,
Plaintiff-Respondent-Cross-Appellant,

v.

Transport Insurance Company,
Defendant-Appellant-Cross-Respondent.†

Court of Appeals

*No. 2011AP192. Submitted on briefs August 7, 2012.
—Decided September 25, 2012.*

2012 WI App 108

(Also reported in 823 N.W.2d 532.)

† Petition for Review filed 10-25-12.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of G.

*Michael Halfenger* of *Foley & Lardner, LLP*, Milwaukee; *Lawrence D. Mason* and *John A. Lee* of *Segal McCambridge Singer & Mahoney, Ltd*, Chicago, IL.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Gregory B. Conway* and *R. George Burnett of Liebman, Conway, Olejniczak & Jerry, S.C.*, Green Bay; *John G. Buchanan III* of *Covington & Burling LLP*, Washington, DC; *P. Benjamin Duke* of *Covington & Burling LLP*, New York, NY.

Before Hoover, P.J., Peterson and Mangerson, JJ.

¶ 1. HOOVER, P.J.   Transport Insurance Company appeals a judgment declaring that an excess umbrella policy issued to NCR Corporation provided coverage for NCR's liability for polychlorinated biphenyl (PCB) contamination of the Lower Fox River in Wisconsin. Transport also appeals a judgment entered against it for the $5,000,000 policy limit. Transport argues the circuit court erroneously:   chose to apply Wisconsin law rather than Ohio law; granted NCR summary judgment as to whether the damage was expected or intended; and denied Transport's motion to reopen discovery and reconsider the expected-or-intended decision.

¶ 2.   NCR cross-appeals, arguing it was entitled to a declaration that Transport was also liable for defense costs.

¶ 3.   We hold that the circuit court correctly chose to apply Wisconsin law; erroneously granted summary judgment on the expected-or-intended issue; and properly exercised its discretion to deny the discovery and reconsideration motion. Given our resolution of Transport's appeal, we dismiss NCR's cross-appeal.

497

## BACKGROUND

¶ 4.   NCR filed this coverage action in November 2005 against twenty-five insurers that had issued more than eighty primary and excess general liability insurance policies between 1953 and 1985. NCR sought a declaration of rights under the policies concerning its liability for PCB contamination from a product used in papermaking from approximately 1954 to 1971. Most of the various insurers settled with NCR over the course of the proceedings, and Transport is the only insurer proceeding on appeal.

¶ 5.   Transport[1] issued NCR a policy covering February 1, 1983 to January 1, 1984. The policy provided excess liability coverage, with a $5,000,000 limit per occurrence for indemnity loss, above two underlying layers of general liability insurance. First, a primary layer issued by National Union Fire Insurance Company provided $1,000,000 of primary indemnity coverage per occurrence. Second was an umbrella policy by First State Insurance Company that provided $25,000,000 of indemnity coverage per occurrence. Transport's third-layer policy was part of a $25,000,000 layer of coverage provided together with several other insurers.

¶ 6.   The parties conducted an initial phase of discovery limited to the issue of which state's law should apply to the insurance policies, none of which contained a governing-law clause. NCR moved to apply Wisconsin law. Several insurers, including Transport, moved to apply Ohio law. The circuit court issued an eighteen-page decision in October 2007 holding that

---

[1] The policy was issued by Transport's predecessor, Transport Indemnity Company. We refer to the two entities interchangeably.

Wisconsin law applied under both the "grouping of contacts" and "choice-influencing factors" analyses.

¶ 7. Following extensive discovery, NCR and the insurers filed seventeen motions and cross-motions for summary judgment on various coverage issues and defenses, including whether the pollution damages were "expected or intended" and whether there was a "known loss" at the time NCR purchased the policies. The court granted NCR summary judgment on the "expected or intended" issue, but held that material issues of fact precluded summary judgment as to the known-loss doctrine.

¶ 8. Ten days before trial, the court imposed a stay pending our resolution of the appeal in a related case involving NCR's successor, Appleton Papers. After the stay was lifted, the insurers moved to reopen discovery and reconsider the expected-or-intended decision in light of documents obtained by other parties in a related federal court action. The court denied the motion. The four insurers still remaining in the action, including Transport, then stipulated to the factual basis for coverage under the policies, and withdrew all coverage defenses that were set for trial, including their "known loss" defense. Thus, the court granted judgment declaring the insurers liable to NCR for Fox River pollution-related losses under their policies. Transport appeals, and NCR cross-appeals.

## DISCUSSION

*Choice of Law*

¶ 9. Transport argues the circuit court applied the wrong choice-of-law analysis and erroneously applied Wisconsin law to this insurance coverage dispute.

Transport contends that because this case involves a contract, we apply only the grouping-of-contacts analysis to determine which state's law applies. Transport seeks to apply Ohio law because Ohio courts have interpreted identical insurance policy language differently than the Wisconsin Supreme Court. Under Ohio's interpretation of the "sudden and accidental" pollution exclusion clause, Transport's policy would not provide coverage for NCR's liability for PCB pollution of the Fox River. We conclude the circuit court correctly chose to apply Wisconsin law.

¶ 10. First, we reject Transport's argument that we must apply only the grouping-of-contacts analysis. Rather, we hold that the contacts analysis is only one step in determining the choice of law. As "Wisconsin's choice-of-law jurisprudence . . . has had something of a checkered past"; a question arises as to whether we should apply the contacts analysis, the choice-influencing-factors analysis, or both, in a given type of case. *Drinkwater v. American Family Mut. Ins. Co.*, 2006 WI 56, ¶¶ 32–36, 290 Wis. 2d 642, 714 N.W.2d 568. Nonetheless, the court most recently observed that "we need not attempt to reconcile all of the cases." *Id.*, ¶ 34. It then concluded it should apply the choice-influencing factors because it was deciding an insurance case, which involves "tightly bound" issues of contract and tort. *Id.*, ¶¶ 36–39 (citing *State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶ 31, 251 Wis. 2d 561, 641 N.W.2d 662). The court indicated it would therefore follow *Gillette*'s choice-of-law framework. *Id.*, ¶ 39. Further, the court observed, "The framework in *Beloit Liquidating* is similar. Thus, we look also to its principles to guide us." *Id.* (citing *Beloit Liquidating Trust v. Grade*, 2004 WI 39, 270 Wis. 2d 356, 677 N.W.2d 298).

¶ 11.  We believe the case law is largely reconcilable. As the circuit court concluded, albeit by a slightly different rationale, the grouping-of-contacts analysis is subsumed by the choice-influencing-factors analysis. Specifically, the grouping-of-contacts analysis is merely step one of the choice-influencing-factor analysis. Indeed, while not saying as much, the supreme court first conducted a grouping-of-contacts analysis prior to conducting its choice-influencing-factor analysis in *Drinkwater*, 290 Wis. 2d 642, ¶¶ 43–45, *Beloit Liquidating*, 270 Wis. 2d 356, ¶ 24, and *Gillette*, 251 Wis. 2d 561, ¶ 52. *See infra,* n.2.

¶ 12.  The choice-influencing-factor analysis consists of two steps. "First, we must judge 'whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling.' " *Beloit Liquidating*, 270 Wis. 2d 356, ¶ 24 (quoting *American Standard Ins. Co. v. Cleveland*, 124 Wis. 2d 258, 263, 369 N.W.2d 168 (Ct. App. 1985)). Because there is a weak presumption in favor of applying the forum law, the nonforum state's contacts must be clearly more significant for that state to prevail under this first step. *Drinkwater*, 290 Wis. 2d 642, ¶ 40.

¶ 13.  Where a contract is involved, we consider the following "grouping of contacts," set forth in § 188 of the Restatement (Second) of Conflicts:    (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Haines v. Mid-Century Ins. Co.*, 47 Wis. 2d 442, 446, 177 N.W.2d 328 (1970) (citing

501

RESTATEMENT (SECOND) OF CONFLICTS § 188 (Proposed Official Draft, Part II)). Where tort law is implicated, we additionally consider the locations of the injurious conduct and injury.[2] *See Drinkwater*, 290 Wis. 2d 642, ¶ 44; *Beloit Liquidating*, 270 Wis. 2d 356, ¶ 24; *see also* RESTATEMENT (SECOND) OF CONFLICTS § 145 (1971), *supra* n.2. Further, there is a special rule in the case of "fire, surety, or casualty insurance"; priority consideration goes to the "state which the parties understood was to be the principal location of the insured risk during the term of the policy." *Haines*, 47 Wis. 2d at 448

---

[2] Where no contract is involved, as in *Beloit Liquidating Trust v. Grade*, 2004 WI 39, 270 Wis. 2d 356, 677 N.W.2d 298, a court might turn at the first step to the Restatement's sister section concerning tort contacts, § 145. While § 188 focuses on the states' "relationship to the *transaction* and the parties," § 145 is concerned with their "relationship to the *occurrence* and the parties." RESTATEMENT (SECOND) OF CONFLICTS §§ 145, 188 (1971) (emphasis added). Section 145 identifies the following contacts:   (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

In *Drinkwater*, the court considered both the contract and tort contacts together as its first step in the choice-influencing-factors analysis. *See Drinkwater v. American Family Mut. Ins. Co.*, 2006 WI 56, ¶ 44, 290 Wis. 2d 642, 714 N.W.2d 568. In *Gillette*, the court had first conducted a separate contracts contacts analysis, and then conducted a torts contacts analysis as its first step in the choice-influencing factors analysis. *See State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶ 31, 251 Wis. 2d 561, 641 N.W.2d 662. The lesson we extract from these cases is that we must first analyze both the contract and tort contacts of the states in insurance cases, where contract and tort law converge. *Drinkwater*'s approach is more efficient and logical; it is also our supreme court's most recent guidance.

(quoting RESTATEMENT, *supra*, § 193 (Proposed Official Draft, Part II)). If one state's contacts are clearly more significant, we may terminate our analysis and apply that state's law. *Drinkwater*, 290 Wis. 2d 642, ¶¶ 40, 41 n.5, 43, 45.

¶ 14.   If necessary, we next proceed to step two and consider the choice-influencing factors set forth in *Heath v. Zellmer*, 35 Wis. 2d 578, 595, 151 N.W.2d 664 (1967). *Drinkwater*, 290 Wis. 2d 642, ¶ 40; *see also Haines*, 47 Wis. 2d at 450–51 (proceeding to choice-influencing factors after concluding the grouping-of-contacts analysis did not clearly require application of either state's law). The factors are:   (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Drinkwater*, 290 Wis. 2d 642, ¶ 40. These factors "should be considered when taking into account choice of law considerations, *regardless of the precise area of law involved.*"[3] *Beloit Liquidating*, 270 Wis. 2d 356, ¶ 25 (emphasis

---

[3] Transport relies on *Kender*, which applied only the grouping-of-contacts analysis because the court concluded the insurance coverage issue was a contract, rather than tort, issue. *See Kender v. Auto - Owners Ins. Co.*, 2010 WI App 121, 329 Wis. 2d 378, 793 N.W.2d 88. *Kender*, however, appears to be inconsistent both with *Beloit Liquidating*'s holding that the choice-influencing factors apply to all types of cases and with *Drinkwater*'s recognition that tort and contract issues are tightly bound in insurance cases, where the contract issue does not arise "but for" the underlying tort. *See Beloit Liquidating*, 270 Wis. 2d 356, ¶ 25; *Drinkwater*, 290 Wis. 2d 642, ¶ 38. We therefore do not rely on *Kender*. *See Cuene v. Hilliard*, 2008 WI App 85, ¶ 15, 312 Wis. 2d 506, 754 N.W.2d 509 (to the extent there is a conflict, we follow our supreme court's decisions

added); *see also Zelinger v. State Sand & Gravel Co.*, 38 Wis. 2d 98, 106, 156 N.W.2d 466 (1968) (same).

¶ 15. This approach—considering both the state contacts and the choice-influencing factors in all cases (where one state's contacts are not clearly more significant)—is consistent with the Restatement as well. Both § 188 (the contracts contacts adopted in *Haines*) and § 145 (torts contacts) explicitly provide that their respective contacts are subordinated to the overriding choice-of-law principles identified in § 6. *See* RESTATEMENT, *supra*, §§ 6, 145, 188 (1971). As the circuit court observed, § 6's principles are substantially similar to the *Heath* choice-influencing factors.[4] Thus, except in the simple cases, the choice of law depends on the choice-influencing factors.

A. Step one

■

¶ 16. Having settled upon the proper analysis, we now undertake it—first, the state contacts. We begin with the priority contact in insurance cases, the antici-pated principal location of the insured risk during the

---

rather than a subsequent appellate court decision). In any event, *Kender*'s outcome is consistent with our conclusion that only the states' contacts need be considered if one state's contacts are clearly more significant. *See Kender*, 329 Wis. 2d 378, ¶ 22 (holding: "[T]he significant contacts in this case *strongly favor* Minnesota, not Wisconsin.") (emphasis added).

[4] Like the choice-influencing factors, § 6 contemplates the broader implications of the choice of law, rather than focusing narrowly on the parties' contacts with a given state. *See* RESTATEMENT, *supra*, § 6 (1971). While not identical, there is substantial overlap between the two sets of factors. Indeed, the circuit court described them as "effectively indistinguishable."

policy period. NCR was a global corporation with operations in numerous states and abroad. Thus, no state can be viewed as the principal location of the insured risk. In this instance, the Restatement's comments suggest applying a legal fiction by assuming there is a separate policy applicable to each state's risks. *See* RESTATEMENT, *supra*, § 193 cmt. f. When there are scattered risks, this contact is then diminished in importance. *See id.*, cmt. b. Here, NCR had operations in Wisconsin when the policy issued; in fact, NCR's insurance application stated as much. However, at that time, NCR no longer owned or operated the specific facilities, i.e., risk, ultimately giving rise to its Fox River pollution liability. We conclude this factor weighs negligibly in favor of applying Wisconsin law. Further, we note this factor subsumes the more general § 188 contact, the location of the subject matter of the contract.

¶ 17. Next, we consider the place of contracting. Transport argues the parties entered into the contract in Ohio, where NCR was headquartered. Contracting occurs where "the last act necessary, under the forum's rules of offer and acceptance," occurred "to give the contract binding effect." RESTATEMENT, *supra*, § 188 cmt. e; *see also Paulson v. Shapiro*, 490 F.2d 1, 7 (7th Cir. 1973); *Continental Ins. Co. v. Garrison*, 54 F. Supp. 2d 874, 880–81 (E.D. Wis. 1999). The last act necessary for the policies to take effect was for the insurer to send the policy or a temporary binder of insurance to NCR's brokers, not to NCR itself. *See Weed v. Lepianka*, 30 Wis. 2d 198, 202–03, 140 N.W.2d 305 (1966) (delivery of policy to agent may be binding without physical transfer to insured). NCR's brokers were located outside Ohio, and the "Broker/Agent" listed on the policy is "IBS,

Chicago."[5] Therefore, this contact carries no weight in choosing Wisconsin or Ohio law.

¶ 18. The place of negotiating is also a nonfactor for essentially the same reason. Because NCR did not participate in negotiations, this factor is less significant in the first place. In any event, because the brokers were located in Illinois and Transport was located in California, no negotiations took place in either Wisconsin or Ohio.

¶ 19. We next consider the place of performance. If we view performance as Transport's promise of insurance coverage during the policy period, then performance occurred in every jurisdiction in which NCR was located.[6] This does not aid our choice of law. Similarly, NCR's performance by paying premiums is unhelpful because NCR's Illinois brokers made the payments to Transport. Neither payment nor receipt occurred in Wisconsin or Ohio. Alternatively, if we view Transport's performance as making payment for NCR's Fox River pollution liability, then performance will occur either in Wisconsin if Transport pays directly for remediation or at NCR's current headquarters in Georgia if Transport instead reimburses NCR. Thus, we conclude this factor carries little weight and, if anything, favors applying Wisconsin law.

---

[5] The circuit court held: "I conclude the place of contracting was where NCR's brokers were located, regardless of whether the final act of contracting was delivery of the policy or sending payment for the insurance. Both were to/by the brokers in Illinois, as agents of NCR."

[6] Transport asserts, without explanation or legal authority, that Ohio was the place of performance because the policy required it to give any notice of cancellation to NCR at its Ohio headquarters. We deem this assertion frivolous and do not address it further.

¶ 20. The final Restatement § 188 (*Haines* grouping of contacts) contact is the domicile, residence, nationality, place of incorporation and place of business of the parties. NCR was headquartered in Ohio, incorporated in Maryland, and conducted business in numerous jurisdictions, including Wisconsin. Transport was located in California. This factor weighs negligibly in favor of Ohio.[7]

¶ 21. We next consider the additional Restatement § 145 contacts, the locations of the injurious conduct and injury.[8] Here both the conduct—the release of PCBs—and the injury—PCB contamination of the Fox River—occurred in Wisconsin. Thus, these factors both point exclusively to Wisconsin. As these are the only factors that conclusively weigh in favor of either Wisconsin or Ohio law, the factors are qualitatively stronger than any of the others.

¶ 22. Having considered all of Ohio's and Wisconsin's contacts to the case, we conclude that Ohio's respective contacts are "so obviously limited and minimal that application of that state's law [would] constitute[] officious intermeddling." *See Beloit Liquidating*, 270 Wis. 2d 356, ¶ 24. Quite simply, it would be unreasonable to apply Ohio law given its limited connection to the case. This is especially true in light of the weak presumption in favor of applying the forum law. *See Gillette*, 251 Wis. 2d 561, ¶ 50. Moreover, the significance of any of Transport's state contacts in this case is diminished by virtue of Transport's policy being

[7] The various defendant insurers in this action were incorporated or headquartered in twelve different states—including Wisconsin—and in England. None were incorporated or headquartered in Ohio at the time any of the policies issued.

[8] The other Restatement § 145 contacts overlap with the § 188 contacts. *See supra*, n.2.

a follow-form excess policy. Transport's state contacts are subordinate to the state contacts of the underlying, operative policy.

### B. Step two

¶ 23. Given our step-one analysis, we need not proceed to step two, applying the choice-influencing factors. *See Drinkwater*, 290 Wis. 2d 642, ¶¶ 40, 41 n.5, 43, 45. Were we to fully address the factors, however, we would agree with the circuit court's well-reasoned conclusion that this analysis would also lead to applying Wisconsin law. Particularly, we agree with the court's conclusions regarding predictability. First, the risk of unpredictability when omitting a choice-of-law provision more appropriately falls on the commercial general liability insurer. *See id.*, ¶ 49; *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, ¶ 115, 264 Wis. 2d 60, 665 N.W.2d 257. Second, the court explained:

> [Applying Wisconsin law] does no injustice to any expectations of the parties because, at the time of contracting, they had no reason for differing expectations. . . . [T]hey would have expected the policies to be interpreted according to the traditional rules of insurance contract interpretation. Because the law of both states is the same in this regard, the parties will get precisely what they bargained for [regardless of] whether Wisconsin or Ohio law is ultimately applied. It is merely fortuitous that, when applying the same rules of construction years down the road, one panel of jurists concluded the contracts were ambiguous and another did not.

¶ 24. Moreover, we observe that it would be peculiar to expect that Transport's third-layer excess "follow-form" policy would dictate the choice of law

applicable to the underlying policy by a different insurer, would be interpreted and applied differently than that underlying policy,[9] or would be subject to a choice of law different from the sibling excess policies of other insurers with which it co-provided the excess layer of coverage.

*Expected or Intended Limitation*

¶ 25.  Transport argues the circuit court erroneously granted NCR summary judgment holding that the damage was neither expected nor intended under the policy definition of occurrence. The underlying policy stated:    " 'Occurrence' shall mean an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the insured." (Capitalization omitted.)

¶ 26.  Transport's argument consists of several components. First, it contends several cases hold that an insured's expectation of damage is evaluated up through the time of policy inception. NCR, on the other hand, asserts that its expectations must be evaluated as of the time of the conduct causing the damage. We agree with NCR.

¶ 27.  At the outset, we recall that the circuit court denied NCR's summary judgment motion on the known loss doctrine, preserving that issue for trial, but Transport waived that defense and abandoned the trial. This court has previously explained:

---

[9] Because Transport's policy merely followed form to the underlying policy, it did not contain the "sudden and accidental" policy language at issue that was later interpreted differently by the Ohio and Wisconsin courts.

> The known loss doctrine is distinct from the insurance contract term usually found in CGL policies defining an occurrence as "unintended or unexpected from the standpoint of an insured." The doctrine focuses on the time the insurance contract is entered into, whereas *the policy definition of occurrence focuses on the time of the act for which insurance is sought.*

*State v. Hydrite Chem. Co.*, 2005 WI App 60, ¶ 19, 280 Wis. 2d 647, 695 N.W.2d 816 (emphasis added) (citing *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995); *General Housewares Corp. v. National Sur. Corp.*, 741 N.E.2d 408, 416 (Ind. App. 2000)). Transport suggests *Hydrite's* statement is mere dicta that we should disregard. We cannot do so. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) (court of appeals may not overrule, modify, or withdraw language from a prior published opinion). Therefore, *Hydrite* has already settled the question in NCR's favor.

¶ 28.  Additionally, Transport's cited cases fail to support its assertion that courts "routinely hold that an insured's expectation of damage is evaluated through the time of policy inception." In fact, two of the three cases cited support the contrary position, including the sole Wisconsin case. In both *City of Bronson v. American States Insurance Co.*, 546 N.W.2d 702, 706 (Mich. App. 1996), and *City of Elkhorn v. 211 Centralia Street Corp.*, 2004 WI App 139, ¶¶ 2, 22, 24, 275 Wis. 2d 584, 685 N.W.2d 874, the courts concluded there was no occurrence because the damage was expected at the time the insured acted.

¶ 29.  Thus, Transport is left with but a single supporting case—hardly substantiation that courts "routinely hold" that expectation is evaluated as of the time of policy inception. Moreover, that case did not

even discuss whether the insured's expectation should be measured as of the time of the conduct or of policy inception. *See Overton v. Consolidated Ins. Co.*, 38 P.3d 322 (Wash. 2002). Rather, the court simply looked to the time of policy inception without explication.

¶ 30.   Finally, Transport does not undertake any independent analysis of the policy language. The "damage neither expected nor intended [by the insured]" clause is plainly intended to foreclose insurance coverage for intentional harms. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 490, 497, 588 N.W.2d 285 (Ct. App. 1998) (coverage is precluded only if "the insured intended or expected some injury or harm to follow from [an intentional] act"); *Patrick v. Head of the Lakes Co-op. Elec. Ass'n*, 98 Wis. 2d 66, 69–70, 295 N.W.2d 205 (Ct. App. 1980) (the phrase requires consideration of "the state of mind of the actor as it relates to the resultant damage"). Thus, the only reasonable interpretation is that the insured's expectations must be evaluated at the time of acting; one cannot form after-the-fact intent for prior acts. Moreover, Transport's interpretation is unreasonable. If the proper focus of the expectation-or-intent inquiry is the time of policy inception, then what comes of the insured's intentional harms caused *after* the policy commences?

¶ 31.   Transport next argues that the "expected or intended limitation is applied objectively—evidence showing that a reasonable person would have expected the damage defeats coverage." We disagree. Indeed, we question how one could apply an objective standard to the policy language:   "expect[ation] []or inten[t] *from the standpoint of* the insured." (Emphasis added.) Transport relies on a passage taken out of context from *City of Elkhorn*, 275 Wis. 2d 584, ¶ 26. There, we

511

recognized the long-standing rule that intent is generally a question of fact for the jury. *Id.*, ¶ 25; *see also Raby v. Moe*, 153 Wis. 2d 101, 112, 450 N.W.2d 452 (1990). However, we further explained that, "only in narrow circumstances," intent to harm could be inferred by a court as a matter of law. *City of Elkhorn*, 275 Wis. 2d 584, ¶ 26. The intent question may be taken from the jury only if there is but one reasonable inference to be drawn from the facts. *See id.*, ¶ 27; *see also* WIS. STAT. § 802.08(2).[10] Stated otherwise, subjective intent may be inferred as a matter of law only if harm is "substantially certain" to occur from the conduct. *Pachucki v. Republic Ins. Co.*, 89 Wis. 2d 703, 710–11, 278 N.W.2d 898 (1979) (quoting *Falk v. City of Whitewater*, 65 Wis. 2d 83, 86–87, 221 N.W.2d 915 (1974), and PROSSER, LAW OF TORTS 31–32 (4th ed. 1971)).

¶ 32. Further, we must reject Transport's reasonable-person standard, which might preclude coverage in the case of NCR's mere negligence. " 'The law may treat gross negligence as equivalent to intentional wrongdoing for some purposes, but not for the purpose of excluding liability for gross negligence from the coverage of a liability insurance policy.' " *Id.* at 709 (quoting *Peterson v. Western Cas. & Surety Co.*, 5 Wis. 2d 535, 542, 93 N.W.2d 433 (1958)).

¶ 33. Finally, we address Transport's assertion that it, rather than NCR, is entitled to summary judgment or, alternatively, that there are material issues of fact in dispute. We hold that there are disputed material issues of fact precluding summary judgment.

---

[10] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

Therefore, neither party is entitled to summary judgment concerning the expected or intended limitation.

¶ 34. NCR's paper mills manufactured carbonless copy paper using an emulsion coating that contained PCBs, specifically Aroclor 1242. NCR last used PCBs and released them into the Fox River in May 1971. However, NCR sold PCB-containing paper waste to other mills on the river for several years thereafter, knowing that their recycling processes would release additional PCBs into the river.[11]

¶ 35. The first scientific study identifying the presence of PCBs in wildlife was published in Sweden in November 1966. The insurers' expert was able to identify two other published studies between November 1966 and May 1971 that identified concerns about the biopersistence of certain PCBs. Although these studies began documenting the effects of certain types of higher chlorinated PCBs generally, they did not specifically identify Aroclor 1242.

¶ 36. Throughout NCR's period of PCB use, various types of PCBs, including Aroclor 1242, were widely used in hundreds of commercial products, including paints, coatings, and many other common consumer products. When NCR stopped using PCBs in May 1971, no state or federal laws or regulations existed limiting or specifically addressing the discharge or disposal of PCBs. The federal government's 1972 Interdepartmental Task Force report observed, "The chemical and physical properties, . . . the difficulty of separation and analysis as well as the non- or ill-defined nature of the

---

[11] We make no judgment whether the sale of paper waste to other entities is conduct which may be considered as part of the expected-or-intended analysis. While the parties reference the fact and each suggests it is or is not relevant, neither develops any argument on the matter.

material actually used or reported in many studies have all certainly contributed to making the evaluation of [PCBs'] toxicity and biological data difficult." The Environmental Protection Agency first *proposed* effluent limits for PCBs in December 1974, and the Wisconsin DNR published its first PCB standard in 1975. PCB regulations and standards in the 1970s initially focused on identifying safe or otherwise permissible levels of PCBs in industrial effluents or discharges into water bodies. Regulations specifically identifying Aroclor 1242—as opposed to the higher-chlorinated varieties of PCBs—were not promulgated until the mid-1970s.

¶ 37. As of May 1971, there was essentially no information concerning the volume of Aroclor 1242 or other PCBs that had entered the river from NCR's plants or any other source. No state or federal agency ever found NCR to have violated any environmental law, regulation, or standard at the time of its use of Aroclor 1242. Rather, CERCLA,[12] the source of NCR's liability, imposes strict liability, regardless of fault. *See* 42 U.S.C. § 9607(a) (2011).

¶ 38. On the other hand, an NCR research manager testified that by 1969 NCR had decided to replace Aroclor with a nonchlorinated solvent after he and others had read various journal articles studying the environmental effects of PCBs. In 1970, an NCR licensee, Wiggins Teape, told NCR that concerns had been raised about the accumulation of PCBs in wildlife and that PCBs had been found in wildlife near the Bristol Channel in England, where a Wiggins Teape-NCR facility processed Aroclor. Also in 1970, Monsanto, which

---

[12] The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675 (2011), is commonly known as CERCLA or Superfund.

produced NCR's PCB-containing Aroclor, informed its customers, including NCR, that it was discontinuing PCB sales after reviewing allegations and reports that PCBs had been found in the environment and were contaminants. In 1971, NCR's Appleton Papers division prepared a chronology regarding its PCB use that included several news reports from 1970 raising PCB concerns.

¶ 39. Given the foregoing facts, we cannot conclude as a matter of law that NCR intended or expected with substantial certainty that its PCB releases would cause environmental harm. Considering the early focus on effluent *limits,* one could conclude that in the early 1970s the scientific community did not believe that all PCB discharges were harmful to the environment.[13] The record does not indicate the amount of PCBs NCR was introducing into the Fox River. Further, there were, at the very least, unanswered questions concerning the potential effects of differing types of PCBs. Yet, there was mounting evidence that PCBs were harmful and, at some point, NCR clearly would have known or expected that releases of Aroclor 1242 would cause environmental harm. Some of this evidence was known or available while NCR was still using the product. Therefore, it is appropriate for a jury to determine what NCR actually knew or expected and when it gained that knowledge or

[13] However, while we need not resolve the issue here, we question NCR's suggestion that it had to know or expect the extent of harm—that the PCBs would *continue* to harm the Fox River into perpetuity by an ongoing cycle of sediment mixing into the water column. *See City of Elkhorn v. 211 Centralia St. Corp.,* 2004 WI App 139, ¶ 20, 275 Wis. 2d 584, 685 N.W.2d 874 (no coverage when "the insured intended or expected *some* injury or harm to follow from its act") (emphasis added); *A.O. Smith Corp.,* 222 Wis. 2d at 500 (same).

expectation. The summary judgment motion is reversed and the circuit court shall vacate the judgment for payment of the policy limits.

## *Reconsideration / Discovery Motion*

¶ 40.   Transport suggests the circuit court erroneously denied its motion to reopen discovery, supplement the record, and, ultimately, reconsider the decision granting NCR summary judgment on the expected-or-intended issue. Transport's motion was based on evidence discovered from a third party in a related federal case, where NCR sought contribution from the paper mills that recycled NCR's paper waste.

¶ 41.   Transport does not develop any argument that the circuit court erroneously denied its discovery motion. We therefore do not address this contention further. *See State v. Flynn*, 190 Wis. 2d 31, 39 n.2, 527 N.W.2d 343 (Ct. App. 1994). Transport further fails to explain how the court erred by denying the motion to reconsider. While Transport sets forth the applicable legal standard and provides some purportedly ominous facts, it does nothing more than baldly claim that the court erred. Transport fails to develop any legal argument. *See id.* Moreover, Transport fails to reply to NCR's specific arguments in response. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments are deemed conceded). In any event, the circuit court's denial of the reconsideration motion is a nonissue because we are reversing the summary judgment decision on other grounds.[14]

---

[14] Thus, the public-record evidence discovered in the federal case is available to Transport for use at trial.

*Cross-Appeal on Defense Costs*

¶ 42. NCR cross-appeals, arguing it is entitled to a declaration that Transport must pay a portion of NCR's defense costs. Transport's duty to pay such costs, however, can arise only if the policy affords coverage for the claim. As NCR itself explains, the policy provides that Transport must pay defense costs only if Transport is obligated to pay the policy limit and "NCR's liability for a claim or suit exceeds the underlying indemnity limits of the Transport [p]olicy." Given our resolution of Transport's appeal, it is unnecessary to reach NCR's cross-appeal. Because coverage has not been established, we would be providing a mere advisory opinion. As the issue is not ripe for determination, we dismiss NCR's cross-appeal.

*By the Court.*—Judgments affirmed in part and reversed in part; cross-appeal dismissed; and cause remanded for further proceedings.