COURT OF APPEALS
DECISION
DATED AND FILED

September 24, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1217**

Cir. Ct. No. **2018CV833**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

MICHAEL A. HUGHES,

PLAINTIFF-RESPONDENT,

V.

NATIONAL GENERAL INSURANCE COMPANY,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Judgment affirmed in part; reversed in part, and cause remanded with directions.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   National General Insurance Company appeals from a judgment, entered upon a jury's verdict, finding that it acted in bad faith and was liable to Michael A. Hughes for damages.  For the reasons that follow, we affirm the judgment in part with regard to most of National General's challenges on appeal.  However, pursuant to our discretionary reversal authority, we reverse that part of the judgment awarding Hughes punitive damages in an amount greater than that allowed under WIS. STAT. § 895.043(6) (2021-22).[1]   We remand with directions for the circuit court to amend the judgment to reflect the proper punitive damages amount, as detailed below.

## BACKGROUND

¶2     In 1983, Hughes was involved in a car crash in Michigan.  As a result of the crash, Hughes suffered a spinal cord injury that rendered him partially hemiplegic.[2]  Since the accident, National General has paid for Hughes's medical bills pursuant to an insurance policy issued to Hughes's parents prior to his accident, while Hughes lived in Michigan.  Hughes is provided benefits under the policy according to Michigan's No-Fault Act.  *See* MICH. COMP. LAWS § 500.2006(4) (2024).[3]  Pursuant to the policy, Hughes is entitled to lifetime benefits for all reasonably necessary medical expenses for his injuries resulting from the 1983 accident.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Hemiplegia means that Hughes has weakness on one side of his body—in Hughes's case, it is his right side.

[3] All references to the Michigan Compiled Laws are to the 2024 version.

¶3    Beginning in the early 2000s, Hughes began experiencing severe muscle spasms that caused him to lose consciousness, vomit, and soil himself. Hughes moved from Michigan to Wisconsin in 2002, and in 2009, Hughes began receiving massages to treat his muscle spasms. Initially, National General paid for this treatment.

¶4    In 2017, National General assigned a new adjuster, Jamie Gustafson, to manage Hughes's massage treatments claim. Gustafson questioned the need for ongoing massage treatments. Gustafson identified "red flags" related to Hughes's massage treatments, including that Hughes's condition was not improving with the treatments and that Hughes was receiving no other treatment except for massage therapy and medication.

¶5    Based on Gustafson's identified red flags, she ordered an Independent Medical Examination (IME) in relation to Hughes's claim for massage treatments. Doctor Paul Drouillard, an orthopedic surgeon, was selected to perform the IME. Upon his review, Drouillard concluded that the massage treatments were not medically necessary. National General then discontinued payment for Hughes's massage treatments in May 2017. Hughes did not continue the massage treatments at his own expense.

¶6    In September 2017, Gustafson was terminated from National General, and Hughes's claim was reassigned to the prior adjuster, Christy Meadows. Meadows ordered a second IME, and Dr. Barbara Heller, a physical medicine and rehabilitation specialist, was selected for the review. Heller opined that massages three times per week, for two hours per session, are a medically necessary treatment for Hughes's injuries. National General then reinstated

payment for Hughes's massage treatments. Hughes was without massage treatments for approximately five months.

¶7 Hughes filed the underlying lawsuit in Wisconsin, alleging that National General acted in bad faith when it, among other things, failed to provide or pay for the necessary massage treatments. Hughes sought both compensatory and punitive damages. National General filed a motion arguing that Michigan law (which does not recognize the tort of bad faith for a breach of an insurance contract) controls and that Hughes's exclusive remedy was through Michigan's No-Fault Act. The circuit court denied National General's motion after applying the standard articulated in *State Farm Mutual Automotive Insurance Co. v. Gillette*, 2002 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662.[4]

¶8 The lawsuit eventually proceeded to a jury trial. The circuit court requested briefing from the parties regarding the availability of punitive damages, and it planned to address the issue prior to the end of trial. Following the parties' briefing and a hearing outside the presence of the jury, the court determined that it would provide the jury with a punitive damages instruction and would include a corresponding question on the verdict form. The jury returned a verdict in Hughes's favor, finding National General liable for the bad faith claim, and it awarded Hughes $100,000 in compensatory damages and $1,000,000 in punitive damages.

---

[4] National General filed a petition for leave to appeal the circuit court's order denying its motion to declare that Michigan's No-Fault Act governed this action, which we denied. Afterward, the circuit court also denied National General's motion for summary judgment on Hughes's claim. National General filed a second petition for leave to appeal, this time challenging the court's order denying its summary judgment motion. We also denied the second petition for leave to appeal.

¶9      The parties filed several post-trial motions. National General moved for judgment notwithstanding the verdict, requesting that the circuit court reduce the punitive damages award to $200,000. *See* WIS. STAT. § 895.043(6). It also moved the court to reconsider its decision denying National General's motion to dismiss the bad faith claim because Michigan law should apply. National General also sought the dismissal of the jury's punitive damages award, arguing that there was insufficient evidence presented to demonstrate that National General acted "maliciously" toward Hughes. Lastly, National General asked the court to change two of the jury's answers to "no," such that the verdicts read that National General did not exercise bad faith and did not act maliciously toward Hughes. *See* WIS. STAT. § 805.14(5)(c).

¶10     Conversely, Hughes filed a motion for attorney fees and costs. Hughes sought $365,000 in attorney fees and $37,886.62 in litigation expenses.

¶11     The circuit court did not make a decision on the parties' motions within ninety days of the jury's verdict. *See* WIS. STAT. § 805.16(3). Nonetheless, the court entered an order addressing the parties' motions. The court awarded Hughes an additional $264,870.29 in attorney fees and costs, bringing the total compensatory damages award to $364,870.29. The court also reduced the punitive damages award to $729,740.58. *See* WIS. STAT. § 895.043(6).

¶12     Hughes filed a proposed order for judgment and a bill of costs pursuant to the circuit court's order. National General objected, arguing that the court lacked competency to award additional compensatory damages because the deadline to rule on the motions after the verdict had lapsed. *See* WIS. STAT. § 805.16(3). Later, the court entered its "Final Decision & Orders," ruling that it lacked competency to reduce the jury's punitive damages award. The court stated

that an appellate court would need to exercise its discretionary reversal authority to change the amount pursuant to WIS. STAT. § 895.043(6). The court determined, however, that it had retained competency to rule on Hughes's postverdict motion for attorney fees and costs.

¶13    The circuit court entered a final judgment awarding Hughes $364,870.29 in compensatory damages and $1,000,000 in punitive damages. National General now appeals.

## DISCUSSION

### I. Choice of law

¶14    National General first contends that the circuit court erred by applying Wisconsin law, as opposed to Michigan law, to Hughes's bad faith claim. Michigan's No-Fault Act provides for a statutory penalty of twelve percent interest per year for the bad faith denial of benefits due under an insurance policy. *See* MICH. COMP. LAWS § 500.2006(4). Michigan law does not, however, recognize a common law tort for bad faith breach of an insurance contract. *See Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50, 56 (Mich. 1980).

¶15    In contrast, Wisconsin recognizes bad faith as a tort claim. *See Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶57, 325 Wis. 2d 56, 784 N.W.2d 542. "The tort cause of action for bad faith arises out of a contractual arrangement but is not a contract action." *Id.*, ¶40; *see also Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 687, 271 N.W.2d 368 (1978) ("[B]ad faith is not a tortious breach of contract. It is a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract.").

6

¶16    Whether Wisconsin or Michigan law governs the underlying bad faith claim presents a question of law, which we review de novo. *See Kender v. Auto-Owners Ins. Co.*, 2010 WI App 121, ¶14, 329 Wis. 2d 378, 793 N.W.2d 88. "The choice[-]of[-]law rules of the forum state, Wisconsin, control this question." *Id.* (alterations in original; citation omitted).

¶17    "In contractual disputes, Wisconsin courts apply the 'grouping[-]of[-]contacts' rule, that is, that contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.'" *Gillette*, 251 Wis. 2d 561, ¶26 (third alteration in original; footnote omitted; citation omitted). To determine the jurisdiction with which a contract has its most significant relationship, courts consider: "(a) the place of contracting[;] (b) the place of negotiation of the contract[;] (c) the place of performance[;] (d) the location of the subject matter of the contract[;] and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *NCR Corp. v. Transport Ins. Co.*, 2012 WI App 108, ¶13, 344 Wis. 2d 494, 823 N.W.2d 532.

¶18    The tort choice-of-law analysis dictates that under the "primary choice of law rule," "the law of the forum should presumptively apply unless it becomes clear that non[-]forum contacts are of the greater significance." *Gillette*, 251 Wis. 2d 561, ¶¶51, 67 (citation omitted). The following "five choice-influencing considerations" also bear on the analysis: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Id.*, ¶¶53, 67.

7

¶19    National General asserts that we must employ both choice-of-law analyses in this case to determine whether Michigan or Wisconsin law applies to the bad faith claim.  National General reasons that "while Hughes did not plead a breach of the underlying insurance policy, his claim for bad faith" resulted from a breach of the duty imposed from the relationship established by the policy.

¶20    We disagree that the contract-based, grouping-of-contacts analysis must be applied in the choice-of-law analysis here.[5]  Hughes filed a tort action based on National General's bad faith conduct.  *See **Roehl Transp.***, 325 Wis. 2d 56, ¶40; ***Anderson***, 85 Wis. 2d at 687.  He did not seek a declaration of coverage or enforcement of any contractual right.  Thus, Hughes's right to recover damages hinged on the existence of his tort cause of action against National General, not on any contractual cause of action.  *See **Beloit Liquidating Tr. v. Grade***, 2004 WI 39, ¶¶24-25, 270 Wis. 2d 356, 677 N.W.2d 298 (applying the tort choice-of-law analysis to an intentional tort claim).

¶21    Turning to the tort choice-of-law analysis, we agree with Hughes that the Michigan "contacts with the tort" are not of greater significance than the

---

[5] We do note, however, that the first step in the tort choice-of-law analysis includes a contacts analysis.  *See **State Farm Mut. Auto. Ins. Co. v. Gillette***, 2002 WI 31, ¶51, 251 Wis. 2d 561, 641 N.W.2d 662; ***Beloit Liquidating Tr. v. Grade***, 2004 WI 39, ¶¶24-25, 270 Wis. 2d 356, 677 N.W.2d 298.  The grouping-of-contacts analysis and the tort choice-of-law analysis therefore overlap to some degree.  However, where no contract claim is involved, we do not read Wisconsin precedent as requiring a reviewing court to apply the grouping-of-contacts analysis in a choice-of-law analysis.  Indeed, while *Gillette* and ***NCR Corp. v. Transport Ins. Co.***, 2012 WI App 108, 344 Wis. 2d 494, 823 N.W.2d 532, conducted a grouping-of-contacts analysis with respect to contractual claims, *see **Gillette***, 251 Wis. 2d 561, ¶24 (the interpretation of an insurance policy); ***NCR Corp.***, 344 Wis. 2d 494, ¶¶4, 13-22 (an action for declaration of rights under an insurance policy), neither ***Gillette***, ***NCR Corp.***, nor ***Beloit*** applied the grouping-of-contacts analysis to tort claims.  *See also **Kender v. Auto-Owners Ins. Co.***, 2010 WI App 121, ¶20, 329 Wis. 2d 378, 793 N.W.2d 88 (applying the grouping-of-contacts analysis to a contractual dispute).

Wisconsin contacts, and, therefore, the law of the forum should presumptively apply.[6] *See Gillette*, 251 Wis. 2d 561, ¶52.

¶22 While it is true that National General entered into the policy with Hughes's parents when Hughes lived in Michigan, and that the lifetime benefits provided to Hughes are afforded under Michigan law, the bad faith claim is not directly tied to the 1983 car accident or to the lifetime benefits Hughes receives under Michigan law. At all times material to Hughes's bad faith claim, Hughes was a Wisconsin resident and he was receiving medical treatments in Wisconsin. The medical treatments were recommended by his primary care provider, a licensed doctor in Wisconsin, and the treatments were provided by Wisconsin-based healthcare workers. National General, a North Carolina corporation, was responsible for paying for the Wisconsin medical treatments. The primary choice of law rule therefore favors applying Wisconsin law. *See Schlussler v. American Fam. Mut. Ins. Co.*, 157 Wis. 2d 516, 522, 526, 460 N.W.2d 756 (Ct. App. 1990) (applying the contacts analysis under similar facts and concluding that Wisconsin tort law should apply).

¶23 We next turn to the five choice-influencing considerations. The first consideration, predictability of results, "deals with the parties' expectations."

---

[6] Both parties' appellate briefs violate our Rules of Appellate Procedure. Hughes's brief does not comply with WIS. STAT. RULE 809.19(8)(bm), which states that "[a] brief … must have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover." National General, in turn, improperly cites an unpublished per curiam opinion as authority in violation of WIS. STAT. RULE 809.23(3). Under RULE 809.23(3)(a), "[a]n unpublished opinion may not be cited in any court of this state as precedent or authority … except as provided in par. (b)," which pertains to authored opinions. RULE 809.23(3)(a), (b). A per curiam opinion is not an authored opinion. We admonish counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

*Gillette*, 251 Wis. 2d 561, ¶54. We reject National General's assertion that "[i]t is reasonable to assume that the parties involved in the insurance transaction expected that Michigan law would be applicable to claims under the Michigan policy." As we have emphasized already, Hughes did not file a claim under the policy. If Hughes had filed a contractual claim, predictability might support the application of Michigan law. *See id.* (concluding that predictability favored applying Wisconsin law in that case because the damages afforded under a policy—a predominant issue in the litigation—should be dictated by the law of the forum in which the policy was issued).

¶24 As it pertains to this case, the relevant question under the predictability factor is whether the legal consequence of National General's tortious conduct comports with the predictions or expectations of the parties. *See id.* That said, we decline to give any weight to the predictability factor in this case because—unlike predictability in the contractual context, where parties consensually enter into agreements—predictability "has little or no relevancy to a[] … tort that was never intended or planned." *See **Heath v. Zellmer**,* 35 Wis. 2d 578, 596, 151 N.W.2d 664 (1967). This conclusion is particularly reasonable given that our state supreme court has previously overruled the doctrine of lex loci delicti,[7] *see **Wilcox v. Wilcox**,* 26 Wis. 2d 617, 621, 133 N.W.2d 408 (1965), and alleged tortfeasors should not presume that their alleged tortious conduct will be dictated by the forum where the alleged conduct occurred.

---

[7] "Lex loci delicti is a choice of law principle in tort cases which states that the right to bring an action vests at the place of injury, and courts therefore should apply the law of that place." ***Johnson Controls, Inc. v. Employers Ins. of Wausau**,* 2003 WI 108, ¶108 n.43, 264 Wis. 2d 60, 665 N.W.2d 257 (citation omitted).

¶25    "The second factor, maintenance of interstate and international order, requires that the jurisdiction that is minimally concerned defer to the jurisdiction that is substantially concerned." *Gillette*, 251 Wis. 2d 561, ¶55. Under these facts, Wisconsin has the most significant relationship to the parties. "[M]edical treatments were received in Wisconsin … and the breach of the obligation to make payment occurred in Wisconsin." *See Schlussler*, 157 Wis. 2d at 527. Conversely, Michigan is minimally concerned. National General is not a Michigan corporation. Importantly, National General has put forth no argument or evidence showing that the State of Michigan will be liable under the No-Fault Act for reimbursing National General for Hughes's successful Wisconsin bad faith claim. "We see no burden on international movement as the result of the choice of Wisconsin law." *See Gillette*, 251 Wis. 2d 561, ¶58.

¶26    "The third factor is simplification of the judicial task, a principle in choice of law that states a 'simple and easily applied rule of substantive or procedural law is to be preferred.'" *Id.*, ¶59 (citation omitted). "[A] court's task is rarely simplified when the lawyers and judges must apply themselves to foreign rather than forum law." *Heath*, 35 Wis. 2d at 597. Here, however, applying Michigan law "does not complicate the task of Wisconsin judges. [Michigan law] simply bars further proceedings on noneconomic damages." *See Gillette*, 251 Wis. 2d 561, ¶59. Similarly, applying Wisconsin law obviously does not complicate the task of Wisconsin judges. *See Heath*, 35 Wis. 2d at 597.

¶27    Under these circumstances, we are unpersuaded by National General's argument that applying Wisconsin law to Hughes's bad faith claim "would require that the benefits due under the policy be determined by one system of law, while damages available for the wrongful denial of said benefits be determined by another system." Again, there was no dispute that Hughes was

entitled to coverage under the policy. The circuit court was not tasked with applying the insurance policy, or Michigan law, to determine whether Hughes was entitled to coverage. We therefore look to other choice-of-law considerations. *See Heath*, 35 Wis. 2d at 597 ("[S]implicity may well be outweighed by other considerations ….").

¶28 The fourth factor, to which we give substantial weight under the facts of this case, is advancement of the forum's governmental interests. *See Gillette*, 251 Wis. 2d 561, ¶61. "If it appears that the application of forum law will advance the governmental interest of the forum state, this fact becomes a major, though not in itself a determining, factor in the ultimate choice of law." *Id.*, ¶62.

¶29 In this case, we conclude that Wisconsin's "strong interest in compensating its residents who are victims of torts" outweighs the waiver of bad faith liability to which National General is entitled under Michigan law. *See id.*, ¶61. Although Michigan's legislature has decided to afford lifetime benefits to injured residents—while not recognizing bad faith tort claims—Wisconsin has adopted no such policy. *See Anderson*, 85 Wis. 2d at 685-86.

¶30 Wisconsin courts have a duty to enforce Wisconsin law which recognizes bad faith claims where, as the jury found here, there was no reasonable basis for an insurer to deny a claim for benefits and the insurer either knew or recklessly failed to ascertain that the claim should have been paid. *See Heath*, 35 Wis. 2d at 597; WIS JI—CIVIL 2761 (2012). Of particular importance here, punitive damages are available under a bad faith claim "to punish a wrongdoer and to serve as a deterrent." *See Anderson*, 85 Wis. 2d at 697; *see also Gillette*, 251 Wis. 2d 561, ¶64 (stating that tort law has a deterrent purpose). Limiting

Hughes's "recovery to less than the damages recoverable under Wisconsin tort law undermines Wisconsin's significant interests in fully compensating victims of" bad faith. *See Gillette*, 251 Wis. 2d 561, ¶65. Accordingly, the application of Wisconsin law in this case would undoubtedly "advance this state's significant interest in governing bad faith conduct by an insurer toward a Wisconsin insured." *See Schlussler*, 157 Wis. 2d at 527.

¶31 "The fifth and final factor is the application of the better rule of law." *Gillette*, 251 Wis. 2d 561, ¶66. In *Schlussler*, we held that "the availability of [a bad faith] tort cause of action to compensate for an insurer's bad faith failure to perform as promised under its policy is … the better rule of law" than the no-fault policy of Minnesota. *Schlussler*, 157 Wis. 2d at 527. Minnesota's no-fault statute addressed in *Schlussler* provided for a statutory penalty for overdue and unpaid benefits. *Id.* at 525. Moreover, Minnesota courts construed the statutory penalty as providing the exclusive remedy for the nonpayment of benefits required under the statute. *See id.* Like the Minnesota statutory framework addressed in *Schlussler*, MICH. COMP. LAWS § 500.2006(4) also provides an exclusive remedy for the bad faith denial of benefits due under a policy. *See Kewin*, 295 N.W.2d at 56. Therefore, *Schlussler* dictates that the better rule of law in this case is Wisconsin law.

¶32 In all, after considering the primary choice-of-law rule and the five choice-influencing considerations, we conclude that Wisconsin law applies in the present case. *See Gillette*, 251 Wis. 2d 561, ¶67. The circuit court therefore correctly applied Wisconsin law to Hughes's bad faith claim.

## II. Sufficiency of the evidence—bad faith

¶33 Next, National General asserts that the circuit court erred by denying its WIS. STAT. § 805.14(5)(c) motion to change the jury's verdict on Question No. 1 to "no," so that the verdict would read that National General did not act in bad faith.[8]

¶34 "A motion to change the answer in a jury's verdict challenges the sufficiency of the evidence to support the verdict." *State v. Michael J.W.*, 210 Wis. 2d 132, 143, 565 N.W.2d 179 (Ct. App. 1997).

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

WIS. STAT. § 805.14(1). "We search the record for credible evidence that sustains" a jury's verdict, "and if the evidence gives rise to more than one reasonable inference, we accept the inference the jury reached." *Kubichek v. Kotecki*, 2011 WI App 32, ¶14, 332 Wis. 2d 522, 796 N.W.2d 858. Where, as here, a circuit court upholds a "jury's findings on motions after verdict," "the standard of review is even more stringent." *See id.* "In such cases, we will not overturn [a] jury's verdict unless 'there is such a complete failure of proof that the verdict must be based on speculation.'" *Id.* (citation omitted).

---

[8] Question No. 1 asked: "Did … [National General] exercise bad faith in denying the claim for massage therapy benefits to … [Hughes]?" The jury answered, "Yes."

¶35    To establish a claim for bad faith, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson*, 85 Wis. 2d at 691.    An insurance company is entitled to "challenge claims which are fairly debatable," and it "will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Id.* at 693.    The first prong—whether an insurance company had a reasonable basis for denying benefits—is objective, while the second prong—regarding the insurer's intent—is subjective. *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 377, 541 N.W.2d 753 (1995).

> Under the first prong, the insured must establish that, under the facts and circumstances, a reasonable insurer could not have denied or delayed payment of the claim. In applying this test, it is appropriate for the trier of fact to determine whether the insurer properly investigated the claim and whether the results of the investigation were subjected to reasonable evaluation and review. In other words, … to determine whether the insurer acted in bad faith the trier of fact measures the insurer's conduct against what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim.

*Id.* at 378.    "The subjective component can be inferred from 'a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.'" *Id.* at 392 (citation omitted).

¶36    A reasonable juror could have concluded that a reasonable insurer would not have denied Hughes's massage treatments claim if the juror believed that National General failed to provide the records necessary for Dr. Drouillard to properly evaluate Hughes's treatment needs. *See McEvoy v. Group Health Co-op. of Eau Claire*, 213 Wis. 2d 507, 526, 570 N.W.2d 397 (1997) (stating that

an HMO may be liable for a bad faith claim "if the HMO conducts its evaluation of a care or coverage request in such a way as to prevent it from learning the true facts upon which the plaintiff's claims are based").

¶37    Indeed, the jury was presented with evidence that National General violated its own policy by failing to provide sufficient records to Dr. Drouillard in order for him to accurately determine whether Hughes' continuing massage therapy was necessary.    According to National General's Claim Handling Guidelines, an IME "is conducted by an independent licensed physician of the appropriate medical specialty who does a thorough review *of all available medical records*." (Emphasis added.)  After conducting the IME, Drouillard concluded, "I do not believe massage therapy is going to be of benefit to [Hughes]."  However, at trial, Drouillard testified that "some massage therapy may be necessary from time to time."  Drouillard testified that his conclusion changed because he was provided "some additional information" during his deposition that he "didn't have when [he] first initiated [his] report" to National General.   The additional information included medical notes from 2006, 2007, and 2008.[9]

¶38    Doctor Drouillard was also unable to recall whether he had reviewed certain records from Dr. Thomas VanSistine—a physical medicine and rehabilitation physician in Appleton, who prescribed the massage therapy for Hughes—or whether he had reviewed records from Hughes's massage therapist. Robin   Kuri-Gabor—Gustafson's   supervisor—testified   that   after   reviewing

---

[9] Citing Dr. Drouillard's cross-examination, National General argues that the "additional documentation presented did not alter Drouillard's opinion that continuous long-term massage was not medically necessary."  However, Drouillard's initial opinion in his report to National General stated that no massage therapy was medically necessary.  This particular opinion changed based on additional records that were not provided to Drouillard for the IME.

Drouillard's report, she sent an email to Gustafson stating that Drouillard "only has records that date back to 2014." Kuri-Gabor questioned whether those records "would … be enough of a review to defend in court."

¶39 Similarly, Hughes also presented sufficient evidence for a reasonable juror to conclude that National General should have hired a physical medicine and rehabilitation physician rather than an orthopedic doctor to conduct the IME. Gustafson stated that she selected "an orthopedic doctor because [Hughes] was seeing an orthopedic doctor who referred him to [physical therapy] and [occupational therapy]." However, Dr. VanSistine was a physical medicine and rehabilitation physician. Doctor Drouillard testified that when presented with a patient who has a spinal cord injury, he typically consults with a rehabilitation physician. Drouillard nevertheless acknowledged that he did not consult with a rehabilitation physician for the IME. Therefore, a reasonable juror could conclude that, due to National General's failure to hire a doctor with the correct specialization, the IME was improperly conducted.

¶40 Hughes also presented sufficient evidence for a reasonable juror to conclude that National General recklessly disregarded the fact that it did not have a reasonable basis to deny Hughes's treatments claim and that it showed a reckless indifference to facts favoring payment of the claim. In particular, a reasonable jury could conclude that Gustafson ignored the fact that Dr. VanSistine prescribed the massage treatments. Gustafson stated that she ordered an IME despite the fact that she did not understand "how the massage therapy would treat … spasms." The later conclusions by Dr. Heller and VanSistine that the massage treatments were a medical necessity for Hughes were supported by the undisputed fact that National General knew of the seriousness of Hughes's condition—and that VanSistine had prescribed the massage treatment—yet National General refused to

pay for such treatment, resulting in Hughes experiencing increased muscle spasms and related symptoms. In June 2017, VanSistine informed Gustafson that Hughes's massage treatments were a medical necessity and offered to discuss the payment denial with Gustafson. Yet, Gustafson did not follow up with VanSistine at that time to revisit Dr. Drouillard's conclusions from the IME. Moreover, the jury could infer from the evidence at trial that National General knew that Hughes's massage therapy was undoubtedly a medical necessity before it terminated payment based on the fact that National General consulted with Heller for a second opinion in September 2017, almost immediately following Drouillard's review and Gustafson's termination.[10]

¶41    A reasonable juror could also conclude, based on the evidence presented, that Gustafson's review of Hughes's medical treatments claim was blatantly incorrect and that she sought out reasons for denying the claim. Gustafson stated in her deposition[11] that she could not recall what inconsistencies she saw in Hughes's records that led her to order an IME. Gustafson claimed that she ordered the IME because she "wanted a third-party, unbiased opinion" on the necessity of Hughes's massage treatments. However, she admitted that she had not concluded that Dr. VanSistine was "biased."

¶42    In addition, a reasonable juror could conclude that National General acted in bad faith by denying payment for Hughes' massage treatments based upon the testimony of Kuri-Gabor, Terry Johnson (an expert hired by National General),

---

[10] A National General human resources employee referred Gustafson for employment termination on August 22, 2017. Gustafson's employment with National General was terminated the following month.

[11] Gustafson's deposition was played for the jury. She did not testify at trial.

18

and Daniel Doucette (an expert hired by Hughes). Each of these witnesses stated that they did not see any "red flags" in Hughes's massage treatments claim. Kuri-Gabor also testified that she had deferred to Gustafson to determine whether Dr. Drouillard's review was sufficient, even after questioning Drouillard's review and despite having knowledge that Gustafson "was not performing her [claim] reviews correctly." Doucette testified that the red flags identified by Gustafson "looked like they were made up to justify [Gustafson's] actions rather than real red flags."

¶43 In summary, a reasonable juror could have interpreted the foregoing evidence to conclude that National General intentionally denied (or failed to process or pay) Hughes's claim without a reasonable basis. In other words, there is credible evidence to sustain a finding of bad faith in favor of Hughes.

¶44 National General claims that it could not have been found liable for bad faith because it simply made a "mistake." However, National General's actions could reasonably be interpreted as denying Hughes's massage treatments claim for several months despite knowing that it did not have a reasonable basis to do so. Alternatively, its actions could be seen as recklessly disregarding the knowledge that Hughes' massage therapy was medically necessary to treat his condition. While another jury may have reached a different result, we will not reweigh the evidence on appeal. *See Kubichek*, 332 Wis. 2d 522, ¶14. Therefore, under these circumstances, the fact that National General eventually sought a second IME and restored payment for Hughes's massage treatments does not forestall a conclusion that National General's earlier actions constituted bad faith. *See Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶¶38-42, 261 Wis. 2d 333, 661 N.W.2d 789 (affirming a circuit court's summary judgment ruling of bad faith based on the insurer's failure "to

take 'honest, intelligent action or consideration based upon knowledge of the facts and circumstances' presented to it *when it denied coverage*" (emphasis added; citation omitted)).

### III.  Punitive damages award

¶45     National General next asserts that the jury's punitive damages award must be vacated because there was insufficient evidence presented at trial to support that award.   We independently review the sufficiency of the evidence presented to submit the question of punitive damages to a jury.   *See Roehl Transp.*, 325 Wis. 2d 56, ¶187.

¶46     "A circuit court submits a question of punitive damages to the jury only after determining, as a matter of law, that there is evidence to support an award of punitive damages."  *Id.* (citation omitted).  A court "should not submit the issue of punitive damages to the jury in the absence of evidence warranting a conclusion to a reasonable certainty that the party against whom punitive damages may be awarded acted with the requisite … conduct."  *Id.*, ¶189 (citation omitted). "Proof of a bad faith claim does not necessarily make the award of punitive damages appropriate."  *Trinity Evangelical Lutheran Church*, 261 Wis. 2d 333, ¶45.

¶47     A "plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."  WIS. STAT. § 895.043(3).

> [A] person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded.  This will require that an act or course of conduct be deliberate.  Additionally, the act or conduct

> must actually disregard the rights of the plaintiff, whether it be a right to safety, health or life, a property right, or some other right. Finally, the act or conduct must be sufficiently aggravated to warrant punishment by punitive damages.

*Strenke v. Hogner*, 2005 WI 25, ¶38, 279 Wis. 2d 52, 694 N.W.2d 296.

¶48    The circuit court determined that sufficient evidence was presented for a reasonable juror to conclude that National General intentionally disregarded Hughes's rights to payment for his medical treatments and care. As a matter of law, we agree that there was sufficient evidence before the jury, which warranted a conclusion that, to a reasonable certainty, National General acted with the requisite conduct.

¶49    Hughes had rights under the policy to medically necessary treatments and care. A reasonable juror could have interpreted the evidence at trial to conclude that National General intentionally disregarded—or was aware that its acts were substantially certain to result in such disregard for—Hughes's rights to payment for his medical treatments and care. In particular, the evidence could be interpreted as showing that Hughes's medical condition was serious and potentially life-threatening. Despite the seriousness of the treatments claim, National General denied payment for Hughes's massage treatments knowing—or recklessly disregarding the fact that—it did not have a reasonable basis to do so. *See supra* ¶¶36-44.

¶50    In addition, Gustafson was put in charge of Hughes's massage treatments claim even while she was on a performance improvement plan.[12] She

---

[12] In March 2017, Kuri-Gabor instituted a performance improvement plan for Gustafson based on Gustafson's failure to follow "the [C]laims [H]andling [G]uidelines set forth by the [Personal Injury Protection] Department."

sought an IME notwithstanding her lack of concern with respect to Dr. VanSistine's prescription for the massage treatments. A reasonable juror could conclude that National General, in violation of its own policy, retained a doctor who did not have the proper specialty to perform the IME and then did not send that doctor all of the necessary medical records. The latter occurred despite Kuri-Gabor raising concerns about the amount of records provided to the doctor. A reasonable juror could conclude that National General, relying on Dr. Drouillard's incomplete review, terminated payment for Hughes's massage treatments. Thus, a reasonable juror could interpret National General's actions as either deliberately disregarding Hughes's rights to payment for his treatments and care, or knowing that its actions were substantially certain to result in Hughes's rights being disregarded.

¶51 Further, sufficient evidence was presented demonstrating that National General actually disregarded Hughes's rights to payment for his treatments and care by failing to pay for Hughes's medical treatments. Without treatment, Hughes was at an increased risk of suffering truncal spasms. Indeed, Hughes experienced increased muscle spasms and related symptoms following National General's decision to discontinue payment.[13]

---

[13] National General contends that the circuit court improperly considered the impact that discontinuation of massage treatments had on Hughes's health because punitive damages are not awarded to compensate claimants for injury. However, this evidence was relevant to National General's intentional disregard for Hughes's rights to the payment of his treatments and care. *See Strenke v. Hogner*, 2005 WI 25, ¶38, 279 Wis. 2d 52, 694 N.W.2d 296. National General also contends that the circuit court applied the wrong legal standard when it submitted the question of punitive damages to the jury. We need not address this argument further, as our review of this issue is de novo. *See Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶187, 325 Wis. 2d 56, 784 N.W.2d 542.

¶52 Lastly, a reasonable juror could interpret the evidence at trial as demonstrating that National General's actions and conduct were sufficiently aggravated to warrant punishment by punitive damages. After National General terminated payment for the massage treatments, it hired a home health care aide, Debra Garcia, to assist Hughes. Garcia testified at her deposition[14] that Gustafson directed Garcia to investigate and surveil Hughes for National General. Gustafson later hired an investigator, other than Garcia, to perform surveillance at Hughes's residence. Garcia also stated that Gustafson attempted to direct Garcia's medical care of Hughes, which Doucette testified was inappropriate, "reckless," and "dangerous." Kuri-Gabor stated that Gustafson's behavior was unethical and that she would not condone such behavior.

¶53 Despite the seriousness of Hughes's condition, testimony evidenced that National General's actions were particularly aggravated due to Gustafson's conduct in investigating Hughes's treatments claim. For example, as discussed above, Gustafson improperly attempted to direct Garcia's medical care of Hughes, and she insinuated that Hughes was receiving "sexual favors" during the massage treatments, telling Garcia, "I'm assuming he's getting paid companionship." As the circuit court stated, Gustafson's interactions with Garcia implicated "some motive" with respect to punitive damages because "insurance companies aren't supposed to do that," as evidenced by the testimony Doucette and Kuri-Gabor provided. In short, sufficient evidence was presented at trial warranting a conclusion, to a reasonable certainty that National General acted with the

---

[14] Garcia's deposition was played for the jury. She did not testify at trial.

23

intentional disregard of Hughes's rights. *See Roehl Transp.*, 325 Wis. 2d 56, ¶189.

## IV. Attorney fees and costs

¶54 National General further argues that this court should reduce the compensatory damages award to $100,000 because no attorney fees or costs "were incurred to obtain a benefit under the [policy]." Alternatively, National General asserts that the circuit court "lost competency" to award attorney fees and costs as compensatory damages because it did not decide Hughes's motion within ninety days. *See* WIS. STAT. § 805.16(3).

¶55 "What damages an insured can recover in a bad faith action is a question of law, which we review independently, benefiting from the circuit court's analysis." *See Jones v. Secura Ins. Co.*, 2002 WI 11, ¶19, 249 Wis. 2d 623, 638 N.W.2d 575. Similarly, we independently determine questions of competency, *City of Eau Claire v. Booth*, 2016 WI 65, ¶6, 370 Wis. 2d 595, 882 N.W.2d 738, and statutory interpretation, *State v. Forrett*, 2022 WI 37, ¶5, 401 Wis. 2d 678, 974 N.W.2d 422.

¶56 Under the so-called "American Rule," "parties to litigation are generally responsible for their own attorney[] fees unless recovery is expressly allowed by either contract or statute, or when recovery results from third-party litigation." *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571, 547 N.W.2d 592 (1996). However, the American Rule does not prevent an insured from recovering attorney fees when he or she successfully proves that an insurer acted in bad faith.

¶57    "By virtue of the relationship between the parties created by an insurance contract, a special duty arises, the breach of which duty is a tort and is unrelated to contract damages." *Id.* at 569-70. "When such a breach occurs, the insurer is liable for any damages which are the proximate result of that breach." *Id.* "[A]ttorney fees should be included in compensatory damages when 'bad faith caused [the insured] to incur legal expenses' because he [or she] 'was forced to retain an attorney to obtain the benefits' of his [or her] insurance policy." *Roehl Transp.*, 325 Wis. 2d 56, ¶163 (second alteration in original; citation omitted). "[A]s damages resulting from the tort of bad faith, attorney fees do not remain attorney fees, but instead are transformed into damages" that are "intended to compensate the victims." *Stewart v. Farmers Ins. Grp.*, 2009 WI App 130, ¶14, 321 Wis. 2d 391, 773 N.W.2d 513. A "circuit court can determine the attorney fees to be awarded as damages in bad faith tort cases." *Roehl Transp.*, 325 Wis. 2d 56, ¶168.

¶58    Citing *DeChant* and case law cited therein, National General contends that Hughes was not entitled to attorney fees and costs in this case because he filed a tort claim and the expenses were not "fees that were incurred to *obtain the policy benefits* that would not have been incurred but for the insurer's tortious conduct." *See DeChant*, 200 Wis. 2d at 572-73 (emphasis added).

¶59    We reject this argument. Wisconsin courts have not limited the scope of a bad faith claim to recovery of only those damages that would be recoverable in a breach of insurance contract action. "The 'proximate result' standard from *DeChant* controls the scope of damages available in a bad faith action, *regardless of whether damages falling within that scope would be otherwise recoverable in a breach of an insurance contract claim*." *See Jones*, 249 Wis. 2d 623, ¶35 (emphasis added). In other words, damages in a bad faith

action can include those damages that would and would not be available in a breach of an insurance contract claim. *See id.*, ¶¶35-36.

¶60    The public policy behind the tort of bad faith supports this conclusion. The "primary purpose [of the tort of bad faith] is to redress all economic harm proximately caused by an insurer's bad faith." *Id.*, ¶36 (alteration in original; citation omitted). Thus, "[i]f an insured successfully proves that the insurer intentionally denied a claim without a reasonable basis, the insured is entitled to recover all damages which are the proximate result of the insurer's bad faith." *Id.*, ¶37; *see also DeChant*, 200 Wis. 2d at 571. Nothing in *DeChant* or subsequent case law limits damages to those available in a breach-of-insurance-contract action.

¶61    Accordingly, the circuit court was permitted to award Hughes his attorney fees and costs associated with his bad faith claim if those fees and costs were the proximate result of National General's bad faith. We conclude that they were. National General's bad faith caused Hughes to incur legal expenses because he was forced to retain an attorney to obtain the relief sought. *See Roehl Transp.*, 325 Wis. 2d 56, ¶163. That relief included damages for the several months that Hughes was without the massage treatments, as well as punishment for National General's baseless termination of the treatments.

¶62    Regarding competency, the jury returned its verdict on January 28, 2022. Hughes filed his motion for attorney fees and costs on February 16, 2022, which the circuit court granted on May 12, 2022. Relying on WIS. STAT. § 805.16(3), National General argues that the court lost competency to award attorney fees and costs because more than ninety days had elapsed between the jury's verdict and the court's order granting Hughes's motion.

26

¶63    WISCONSIN STAT. § 805.16(3) states:

> If within 90 days after the verdict is rendered the court does not decide a motion after verdict on the record or the judge, or the clerk at the judge's written direction, does not sign an order deciding the motion, the motion is considered denied and judgment shall be entered on the verdict.

A circuit court loses its competency to decide post-verdict motions after the ninety-day time limit under § 805.16(3) has expired. ***Brandner v. Allstate Ins. Co.***, 181 Wis. 2d 1058, 1070-71, 512 N.W.2d 753 (1994).

¶64    In ***Gorton v. American Cyanamid Co.***, 194 Wis. 2d 203, 208-09, 533 N.W.2d 746 (1995), a jury found that a plaintiff was entitled to damages in a negligence action. Judgment on the verdict was entered on February 4, 1993. ***Id.*** at 211. One month later, the plaintiff filed a petition requesting an award of attorney fees pursuant to WIS. STAT. § 100.18. ***Id.*** The circuit court concluded that an award of attorney fees was appropriate, and it granted the plaintiff's petition. ***Id.*** An amended judgment was entered on July 30, 1993. ***Id.***

¶65    On appeal, the liable party argued that the circuit court lacked competency to grant the plaintiff's petition for attorney fees because, among other things, more than ninety days had passed from the jury's verdict to the court's amended judgment awarding the plaintiff attorney fees. ***Id.*** at 229; *see also* WIS. STAT. § 805.16. Our state supreme court held that § 805.16 "contemplates trial-related motions—new trial, evidentiary considerations, etc. A petition for attorney fees, on the other hand, is not trial-related; rather, it is verdict-related as it is predicated on a party's prevailing party status." ***Gorton***, 194 Wis. 2d at 230. The court went on to apply a "reasonable time" standard, holding that "the time limit on the request for statutory attorney fees to the [circuit] court 'is a reasonable

time after the court enters a final order or judgment on the merits favorable to the requester.'" ***Id.*** (citation omitted).

¶66    We find the reasoning in ***Gorton*** persuasive in this case.[15]  Hughes's motion for attorney fees and costs was verdict-related, as it was predicated on his prevailing party status.  National General does not argue that the time within which the circuit court awarded the attorney fees was unreasonable, and we therefore deem that argument conceded.  *See **Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.***, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (holding that unrefuted arguments may be deemed conceded).

## V.  Discretionary reversal

¶67    Finally, both parties agree that this court should exercise its discretionary reversal authority to reduce the jury's punitive damages award so that the award complies with WIS. STAT. § 895.043(6), which states that "[p]unitive damages received by the plaintiff may not exceed twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater."  We have already concluded that the circuit court properly awarded $364,870.29 in compensatory damages to Hughes.  Under § 895.043(6), the jury's $1,000,000 punitive damages award—which exceeds twice the amount of the compensatory damages—must therefore be reduced.

---

[15] National General posits that Hughes is bound by the ninety-day limit because his motion and brief in support of the motion for attorney fees and costs cited WIS. STAT. §§ 805.14 and 805.16.  However, National General has failed to identify any authority supporting the proposition that we are bound by those citations in Hughes's circuit court filings.  To the extent National General means to argue that Hughes is estopped or prohibited from raising the present arguments, we reject that assertion because Hughes's later filings on the attorney fees and costs issue cited ***Gorton v. American Cyanamid Co.***, 194 Wis. 2d 203, 533 N.W.2d 746 (1995).

¶68 Because the circuit court lost competency to reduce the punitive damages award, *see* WIS. STAT. § 805.16(3), yet WIS. STAT. § 895.043(6) requires that reduction, and the parties agree, we will exercise our discretionary reversal authority under WIS. STAT. § 752.35 to reduce that award, *see **Schmidt v. Smith***, 162 Wis. 2d 363, 366, 469 N.W.2d 855 (Ct. App. 1991).  We therefore reverse the part of the judgment awarding Hughes $1,000,000 in punitive damages, and we remand for the circuit court to amend the judgment to reflect a punitive damages award of $729,740.58.  The total judgment shall read $1,094,610.87.

*By the Court.*—Judgment affirmed in part; reversed in part, and cause remanded with directions.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.